EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
GRACE JUN: SBN 287973
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
TEL: (619) 233-1525
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF ELISA SERNA by and through its successors-in-interest BRANDON HONEYCUTT and S.H., by and through her guardian PALOMA SERNA; BRANDON HONEYCUTT; S.H., by and through her guardian PALOMA SERNA; MICHAEL SERNA, and PALOMA SERNA, <div align="center">Plaintiffs,</div> v. <br> COUNTY OF SAN DIEGO, WILLIAM GORE in his individual capacity, BARBARA LEE, in her individual capacity, MARK O'BRIEN, in his individual capacity, FRIEDERIKE C. VON LINTIG, in her individual capacity, LORNA ROQUE, in her individual capacity, DANALEE PASCUA, in her individual capacity, HAZEL CAMAMA, in her individual capacity, LACEE LOVISA, in her individual capacity, REISHONE FOSTER, in her individual capacity, COAST CORRECTIONAL MEDICAL GROUP, and DOES 3-30, <div align="center">Defendants.</div> | CASE NO. 20-CV-2096-LAB-MSB <br><br> **SECOND AMENDED COMPLAINT** <br><br> **(1) Deliberate Indifference to Serious Medical Needs (42 U.S.C. §1983)** <br> **(2) Right of Association (42 U.S.C. §1983)** <br> **(3) Failure to Properly Train (42 U.S.C. §1983)** <br> **(4) Failure to Properly Supervise and Discipline (42 U.S.C.§1983)** <br> **(5) *Monell* (42 U.S.C. §1983)** <br> **(6) Wrongful Death (CCP §377.60)** <br> **(7) Negligence** <br> **(8) Violation of Cal. Civ. Code §52.1 (Bane Act)** <br><br><br> **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     GENERAL ALLEGATIONS ..............................................................................4

III.    FACTS REGARDING THE DEATH OF ELISA SERNA ...........................7

IV.    THE COUNTY OF SAN DIEGO, SHERIFF BILL GORE AND OTHER SUPERVISORY DEFEDANTS ARE DELIBERATELY INDIFFERENT TO INDIVIDUALS' CONSTITUTIONAL RIGHTS ................................16

     A.    The Sheriff's Department Has More In-Custody Inmate Deaths than Any Other Large County in California. ................................................. 16

     B.    Sheriff Gore, Lee, the County of San Diego, CCMG, O'Brien, and Does 21 to 30 were aware of a persistent and recurring pattern of Preventable Deaths and Serious Injuries Caused by the Sheriff's Department's Misconduct, Apathy, and Neglect. ................................ 20

     C.    External Audits and Reports Warn Gore and the County of Pervasive Failures to Adequately Train and Supervise Subordinates. ............... 26

     D.    Sheriff Gore and the County of San Diego Refuse to Implement Protocols of Accountability and Transparency to Prevent Constitutional Violations and Inmate Deaths ........................................ 30

     E.    California State Auditor Issues a Scathing Report on San Diego Jails. 35

V.     PLAINTIFFS' CAUSES OF ACTION ...........................................................38

VI.    RELIEF REQUESTED ......................................................................................60

VII.   DEMAND FOR A JURY TRIAL .....................................................................61

COME NOW, the ESTATE OF ELISA SERNA by and through its successors-in-interest BRANDON HONEYCUTT and S.H. by and through her guardian PALOMA SERNA; S.H. by and through her guardian PALOMA SERNA; BRANDON HONEYCUTT; MICHAEL SERNA; and PALOMA SERNA, by their attorneys of record, and allege and complain as follows:

## I.    INTRODUCTION

At the time of her death, Elisa Serna was 24 years old. She was admitted to the Las Colinas Detention Facility on November 6, 2019. Elisa reported that she suffered from an addiction to heroin and alcohol. Elisa was suffering from acute pneumonia. Elisa reported she had used heroin, alcohol, and Xanax two hours before booking. She went to the medical ward on November 6 and 7, but she was only given Zofran an anti-nausea medication, and told to increase her fluid intake. She was scheduled to go to the medical ward again on November 8. But Elisa was not seen.

The Jail staff received a court order mandating "Medical referral for Jail" which meant a "must see." When Elisa went to Medical on November 9, the staff noticed that her skin was dry - a symptom of dehydration. Despite the fact that Elisa had been vomiting for three days, the medical staff simply advised her to drink water. They knew that Elisa was going through withdrawal. Despite a "must see" notation, Elisa saw no doctor on November 9. She was not placed on withdrawal protocol. Instead, Elisa was given extra paper cups.

On November 10, 2019, Elisa was seen for intractable vomiting. She was "orthostatic," meaning that she had low blood pressure when standing up. Elisa was transferred to MOB (Medical Observation Bed) for hydration. A doctor, Carol Gilmore MD, noted that the patient had never been placed in treatment for her withdrawal and ordered Vistaril, which is a treatment for withdrawal. At 1 p.m. on November 10, four days after being booked into Jail, Elisa was given her

first dose of medication to deal with her withdrawal.  She was on a clear liquid diet and she was vomiting now for the fourth day.

The next day, November 11, 2019, Elisa presented clear symptoms that she was dying of dehydration.  Defendant nurse Hazel Camama, who knew that Elisa was continuing to vomit and showing symptoms of delirium, did nothing. Nurse Lorna Roque noted "abnormal vital reading," which causes dizziness and falls. She did nothing. Dr. Friederike C. Von Lintig, who noted that Elisa was admitted to MOB for her fainting spells, denied any medical care to Elisa.  Elisa asked Defendant Von Lintig for an IV, telling her that she had vomited all of her food and drink.  Von Lintig did not even take Elisa's vitals.

At 2:03 p.m., Elisa sat in a wheelchair, straightened her body, head resting on the back of the wheelchair.  She was not verbally responsive.  Her eyes were opened and slightly dilated, with her body stiff.  Elisa's oxygen saturation level was 87%.  A normal oxygen saturation level should fall between 95% and 100%. When blood oxygen levels drop below normal, hypoxia occurs which causes serious damage to one's brain, liver and other organs.  Staff found Elisa lying awake beside the toilet.

Defendant Von Lintig again saw Elisa.  Von Lintig noted "'fainting spell': doubt true seizure and suspect second (sic) gain."  She based this on nothing. Von Lintig took no vitals and conducted no examination.  She ran no blood tests. This determination that Elisa was faking her symptoms was made despite the entry from the day before indicating abnormal blood pressure.  This was despite the entry from earlier that same day that Elisa had an abnormal vital sign with a diastolic blood pressure reading of 59.   If the diastolic pressure is too low, the heart will not get the amount of blood and oxygen it needs.  There had also been an entry in the medical records that Elisa's oxygen level was too low.  There were entries in which Elisa seemed confused, thinking that she was on a bus or yelling

loudly that she could not walk. These are all symptoms of dehydration. Von Lintig took no other action.

Defendant nurse Lorna Roque again noted abnormal vital signs with diastolic blood pressure reading of 54. Defendant Roque knew that this was the second time Elisa had an abnormally low reading and that it had gone down from 59 to 54. Roque did not notify a doctor or take any further action.

At approximately 7 p.m. Defendants Nurse Danalee Pascua and Corporal Lacee Lovisa went to Elisa's cell. They watched as Elisa suffered a seizure, struck her head and fell unconscious onto the floor of her cell. Defendant Pascua stood over Elisa watching her. Pascua and Lovisa then turned around, closed the door and left Elisa on the floor to die. For an hour, no one came to the cell. During this time, Elisa can be seen on the video monitors dying and urinating on herself. The deputy station was immediately across a small hallway. No one monitored Elisa despite the fact that she had been placed in the medical observation unit. Elisa Serna died on the floor of her jail cell. It was an hour before anyone discovered her body.

Approximately 8 hours after she left Elisa to die, Defendant Danalee Pascua logged onto the jail electronic medical system. Pascua wrote that Elisa had "slid" into a sitting position and that she was tensing her arms making it impossible for Pascua to take vital signs. She wrote that Elisa was "sitting with her eyes closed and that Elisa was being 'uncooperative.'" Pascua wrote that she would come back to "recheck vials when patient [was] more cooperative." When she made those entries, Pascua knew it was a lie. She knew that the Medical Examiner's office and investigators would rely on her representations in determining how Elisa died.

After Elisa's death, the medical records containing Pascua's misrepresentation was given to Elisa's parents. Paloma and Michael Serna were

told by County officials that Elisa had been under constant medical care.  They were led to believe that Elisa died of drug overdose.

## II.    GENERAL ALLEGATIONS

1.    Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §1331 and 28 U.S.C. § 1343(3) and (4), *et. seq.*

2.    Venue is proper in the Southern District of California because the acts or omissions which form the basis of the Plaintiffs' claims occurred in San Diego, California, within the Southern District.

3.    At all times relevant to this complaint, decedent Elisa Serna was an individual residing in San Diego County, California.

4.    Brandon Honeycutt, S.H., Michael Serna, and Paloma Serna are Decedent's family members, and the heirs and beneficiaries of the Estate of Elisa Serna.  Brandon Honeycutt was Decedent's husband.  [ECF no. 8.]  S.H. is Decedent's minor daughter.  Michael Serna is Decedent's father.  Paloma Serna is Decedent's mother.  Since Elisa's death, Michael and Paloma have formally adopted S.H. See Exhibit A incorporated by reference herein.  S.H. proceeds in this action through her guardian Paloma Serna pursuant to Federal Rule of Civil Procedure 17(c)(1)(A).  This action on behalf of the Estate of Elisa Serna is brought through Brandon Honeycutt, Decedent's husband, and through S.H., the decedent's minor daughter.

5.    At the time of Elisa Serna's death, Elisa Serna and Brandon Honeycutt were living separately.  No proceeding for the administration of the estate is pending and Brandon Honeycutt and S.H. are the successors in interest under California law and succeed to the decedent's interests, claims, and causes of action. There is no other person with a superior right to commence the action.

6. Brandon Honeycutt, S.H., Michael Serna, and Paloma Serna bring this action in their own right, as well, for the loss of their wife, mother, and daughter, Elisa Serna.

7. Plaintiffs Estate of Elisa Serna, Brandon Honeycutt, S.H., Michael Serna, and Paloma Serna have properly complied with the Government Claim Act. Their claims were submitted to the County of San Diego on May 4, 2020.

8. The County of San Diego never responded to the claims.

9. Plaintiffs have complied with Code of Civil Procedure §364, providing a notice of intent to sue for medical negligence to Friederike C. Von Lintig, Lorna Roque, Danalee Pascua, and Hazel Camama on October 1, 2020.

10. Defendant County of San Diego is a public entity, duly organized and existing under the laws of the State of California. Under its authority, Defendant County of San Diego operates and manages the San Diego County Jails, and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures and practices/customs of the Las Colinas Jail, and its respective employees, contractors and/or agents.

11. Defendant William Gore was, at all relevant times, the Sheriff of the County of San Diego, the highest position in the San Diego County Sheriff's Department. As Sheriff, Defendant Gore was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all San Diego County Sheriff's Department custodial employees and/or agents, medical staff, contractors and Doe Defendants.

12. At all times relevant to this complaint, Defendant William Gore was a policy-maker for the San Diego Sheriff's Department (hereinafter "Sheriff's") and responsible for promulgation of the policies and procedures to comply with the California state mandates and the state and federal Constitutions. Gore was responsible for the supervision and control of officers who are or were employed

by the Sheriff's, who are under his command and/or who report to him, including the Defendants to be named.

13.    At all times relevant to this complaint, Defendant Barbara Lee was the Medical Administrator for the Sheriff's Department.   She supervised the medical and nursing staff, including Doe defendants and contractors.   She directed and oversaw the development and implementation of quality assurance and utilization review policies and procedures.

14.    At all times relevant to this complaint, Mark O'Brien was the President and CEO of Coast Hospitalist Medical Associates, Inc. (CHMA) and Coast Correctional Medical Group (CCMG), third-party contractors who employed, supervised, and trained Von Lintig and Does.

15.    Defendants, Lee, Gore, and O'Brien are sued in their individual capacity for their own personal actions or inaction, and for supervisory liability.

16.    At all times relevant to this complaint, all individual defendants and Does were San Diego sheriff deputies or medical personnel and agents of Defendant County of San Diego; and/or agents or contractors authorized to work at the San Diego Jail.

17.    Las Colinas Jail is owned and operated by County of San Diego and staffed by County of San Diego Sheriff's deputies.

18.    Plaintiffs are truly ignorant of the true names and capacities of Does 3 through 30, inclusive, and/or are truly ignorant of the facts giving rise to their liability and will amend this complaint once their identities have been ascertained as well as the facts giving rise to their liability.

19.    These defendants were agents, servants and employees of each other of the other named defendants and were acting at all times within the full course and scope of their agency and employment, with the full knowledge and consent, either expressed or implied, of their principal and/or employer and each of the other named defendants and each of the defendants had approved or ratified the

actions of the other defendants thereby making the currently named defendants herein liable for the acts and/or omissions of their agents, servants and/or employees.

### III.    FACTS REGARDING THE DEATH OF ELISA SERNA

20.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

21.    At the time of her death, Elisa was 24 years old.

22.    Elisa was admitted to the Las Colinas Detention Facility on November 6, 2019.

23.    Elisa reported to staff that she suffered from an addiction to heroin and alcohol.

24.    Elisa was suffering from acute pneumonia.

25.    Elisa reported that two hours before booking, she had used heroin, alcohol and Xanax.

26.    Elisa went to the medical ward on November 6 and 7, but she was only given Zofran, an anti-nausea medication, and advised to increase her fluid intake.

27.    The jail staff did not prescribe any benzodiazepines to treat alcohol withdrawal.

28.    Elisa was scheduled to return to the medical ward on November 8. However, she was not seen because Elisa went to court.

29.    The jail staff received a court order mandating "medical referral for jail" which meant a "must see."

30.    When Elisa went to medical on November 9, the medical staff observed that Elisa had dry skin, yet another symptom indicating dehydration.

31.    Elisa had been vomiting now for three consecutive days.

32.    The medical staff knew Elisa was going through withdrawal.

33.     Despite a "must see" notation, Elisa saw no doctor on November 9.

34.     Elisa was not placed on withdrawal protocol. She was given extra paper cups and told to drink more water.

35.     On November 10, 2019, Elisa was seen for intractable vomiting.

36.     Elisa was "orthostatic," meaning that she had low blood pressure when standing up.

37.     Elisa was again transferred to Medical Observation Bed (MOB) for hydration.

38.     A doctor, Carol Gilmore, MD, noted that the Medical staff had failed to place Elisa in treatment for her withdrawal.  Dr. Gilmore ordered Vistaril, which is a treatment for withdrawal.

39.     At 1 p.m. on November 10, four days after being booked into jail, Elisa was given her first dose of medication to deal with her withdrawal.

40.     She was on a clear liquid diet and she was vomiting now for the fourth straight day.

41.     On November 11, at 1:15 a.m., Elisa was seen by Defendant nurse Hazel Camama. Camama noted that Elisa had self-induced vomiting clear liquid.

42.     Defendant Camama noted dysphoric affect and that deputies had noted that Elisa laid down on the ground of the cell and engaged in odd behavior, yelling excitedly "I can't walk!"

43.     Defendant Camama noted that Elisa's blood pressure was low.

44.     Defendant Camama did nothing to provide medical care to Elisa despite these symptoms.

45.     Defendant Camama knew that Elisa was going through withdrawal and that Elisa was pregnant.

46.     At 8:40 a.m. Defendant nurse Lorna Roque noted "abnormal vital reading."

47.    Elisa's blood pressure was diastolic at 59, meaning abnormally low, which causes dizziness and falls.

48.    Elisa was so nauseous that she was inducing vomiting.

49.    At 1:35 p.m., a doctor noted that Elisa had not been brought to the clinic.

50.    Dr. Gilmore noted that Elisa was in a cell and that she had suffered a "spell." She was given 1 mg of Ativan.

51.    At 1:53 p.m. Defendant Dr. Friederike C. Von Lintig saw Elisa in the MOB. She noted that Elisa was admitted to the MOB for her fainting spells.

52.    Dr. Von Lintig wrote "according to medical staff there had been high suspicion for I/P staging her 'fainting spells' for secondary gain purposes."

53.    By this time, Elisa had lost consciousness multiple times and had fallen to the ground.  This was witnessed by the Jail staff who determined that Elisa was "staging" her loss of consciousness.  Instead of examining her patient and using science to determine the patient's ailment, Von Lintig simply repeated a baseless suspicion that Elisa was faking her symptoms for some unknown secondary gain.  Based on this "suspicion," Von Lintig refused to render any medical care to Elisa.

54.    Elisa asked Von Lintig for an IV, telling her she vomited up all of her food and drinks.  Von Lintig refused.

55.    Without even taking her vitals, Defendant Von Lintig once again took Elisa out of MOB and into "Main Line" housing where she would not be monitored.

56.    At 2:03 p.m., Elisa sat in a wheelchair, straightened her body, head resting on the back of the wheelchair. She was not verbally responsive.

57.    Elisa's eyes were opened and slightly dilated, with her body stiff.

58.    Her oxygen saturation level was 87%. A normal oxygen saturation level should fall between 95% and 100%. When blood oxygen levels drop below

normal, hypoxia occurs which causes serious damage to one's brain, liver and other organs.

59.     At 2:11 p.m., Elisa was given 1 mg of Ativan and staff found Elisa lying awake beside the toilet.

60.     At 2:14 p.m., Defendant Von Lintig again saw Elisa. She noted the incident in which Elisa stiffened her body in the wheelchair.

61.     Elisa told Von Lintig that she felt weak.

62.     Defendant Von Lintig wrote in Elisa's medical charts, "'fainting spell': doubt true seizure and suspect second (sic) gain." She based this on nothing.

63.     Von Lintig did not take Elisa's vitals and did not conduct an examination. She ran no blood tests.

64.     This determination that Elisa was faking her symptoms was made despite the entry from the day before indicating abnormal blood pressure.

65.     This was despite the entry from earlier that same day that Elisa had an abnormal vital sign with a diastolic blood pressure reading of 59. If the diastolic pressure is too low, the heart will not get the amount of blood and oxygen it needs.

66.     There had also been an entry in the medical records that Elisa's oxygen level was too low.

67.     There were entries that stated Elisa seemed confused, thinking that she was on a bus or yelling loudly that she could not walk.

68.     These are all symptoms of dehydration.

69.     Defendant Von Lintig wrote that she suspected "second (sic) gain" and wrote "however, given risk for self-harm and unable to completely exclude Medical cause for claimed weakness and fainting spells, will keep in MOB for obs (observation) for one more day. F/U (follow up) in AM with plan to d/c (discharge) back to ML (mainline) then."

70.     Knowing that she could not exclude a medical reason for Elisa's medical condition, Defendant Von Lintig provided no treatment to Elisa.

71.     Defendant Von Lintig appears to have ignored Dr. Gilmore's notation from the day before that the Medical staff failed to place Elisa in treatment for her withdrawal for days.  There is no indication that Von Lintig continued Elisa's treatment for withdrawal.

72.     At 3:44 p.m., Defendant nurse Lorna Roque again noted abnormal vital signs with a diastolic blood pressure reading of 54.

73.     Defendant Roque knew that this was the second time Elisa had an abnormally low reading and that it had gone down from 59 to 54.

74.     Defendant Roque did not notify a doctor or take any further action.

75.     From November 6 when she was booked until her death on November 11, Elisa was going through withdrawal and suffering from serious ailments.  During this time, Elisa repeatedly lost consciousness and fell to the ground.  Elisa's numerous falls were caught on video tape.  The footage from these cameras were being shown on the screens in a room where deputies are assigned to monitor them.  No deputy reported the falls.  No deputy checked on Elisa.  No one was monitoring the wellbeing of the inmates.  They ignored Elisa fall after fall.

76.     Doe defendants 3 to 10 are deputies who were required to properly monitor inmates and conduct cell checks to ensure their safety.  Defendants Foster, Lovisa and Does 3 to 10 ignored the obvious signs that Elisa was gravely ill.

77.     At one point, Defendant Foster grabbed Elisa by the wrist as Elisa laid on the ground and dragged her into her cell.  Instead of taking Elisa to medical to get help, Foster dragged the nearly unconscious Elisa and left her in her cell.

78.     At approximately 7 p.m. Defendants Danalee Pascua and Lacee Lovisa went to Elisa's cell. They watched as Elisa suffered a seizure in front of them, struck her head and fell unconscious onto the floor of her cell.

79.     Defendant Pascua stood over Elisa watching her.

80.     Pascua and Lovisa then turned around, closed the door and left Elisa on the floor to die.  For an hour, no one came to the cell.

81.     During this time, Elisa can be seen on the video monitors dying and urinating on herself.  The deputy station was immediately across a small hallway. No one, including Foster, Lovisa or Does 3 to 10, monitored Elisa despite the fact that she had been placed in the medical observation unit.  None of the nurses, including Does 11 to 20 checked on Elisa.

82.     Elisa Serna died on the floor of her jail cell.

83.     Approximately 8 hours later, Defendant Danalee Pascua logged onto the jail electronic medical system.

84.     Pascua made an entry that Elisa had "slid" into a sitting position and that she was tensing her arms making it impossible for Pascua to take vital signs.

85.     Pascua wrote that Elisa was sitting with her eyes closed and that Elisa was uncooperative.

86.      She wrote that she would come back to care for Elisa when Elisa was more "cooperative."

87.     When she made those entries, Elisa was dead. Pascua knew the entry was a lie because she was there when they discovered Elisa's body with the onset of rigor mortis and attempted futile attempts to resuscitate her.

88.     Pascua knew that the Medical Examiner's office and investigators would rely on her representations in determining how Elisa died.

89.     After Elisa's death, the medical records containing Pascua's misrepresentation was given to Elisa's parents.  Paloma and Michael Serna were

told by County officials that Elisa had been under constant medical care.  They were led to believe that Elisa died of drug overdose.

90.    No supervisory defendant made Pascua correct her lies.  Instead of disciplining Pascua, the supervisory defendants allowed the medical records to be passed onto Elisa's family thereby perpetuating the lies.

91.    Danalee Pascua has been criminally charged with involuntary manslaughter for causing Elisa Serna's death.

92.    Before Elisa Serna's death on November 11, 2019, Defendant Friederike Von Lintig treated a patient named Colleen Garot, who entered the jail on April 13, 2018 with a black eye and bruises; disorientation and unsteady gait; and abrasions to her forehead from when she lost consciousness when falling. For the next several days, Ms. Garot was observed delusional and foaming at the mouth.  On April 16, 2018, Defendant Von Lintig evaluated Ms. Garot after Ms. Garot was observed naked and delusional with a visible black eye.  Von Lintig noted "no acute [m]edical issues [were] noted at this time."  Von Lintig took no action to treat Ms. Garot.  When Ms. Garot was taken to the hospital later that day, Sharp diagnosed Ms. Garot with a left basilar skull fracture, acute hypoxemic respiratory failure, encephalopathy after traumatic brain injury, subdural hematoma and seizure.

93.    Thereafter, defendant Von Lintig continued her employment at Las Colinas through her employer CCMG.

94.    All medical staff worked under the direction and supervision of Defendants Gore, O'Brien and Lee, and Does 21-30 who set the policies and procedures with respect to medical services.  These defendants were aware of Von Lintig's treatment of Ms. Garot.

95.    Gore, O'Brien, Lee and Does 21-30 took no action after Ms. Garot nearly died and permitted Von Lintig to continue providing services to inmates at Las Colinas.

96.     Symptoms associated with opioid withdrawal syndrome may include anxiety, agitation, yawning, sweating, piloerection (goosebumps), excessive tear formation, runny nose, insomnia, nausea or vomiting, diarrhea, cramps, muscle aches, and fever. Symptoms associated with other illicit drugs can also include seizures, hallucinations, and delirium. Severe complications can include aspiration of vomit, dehydration, and electrolyte disturbances due to diarrhea and/or vomiting.

97.     People who are using drugs or alcohol prior to being detained may experience the onset of withdrawal syndrome in jail. Withdrawal management services must assess, monitor, and address acute physical symptoms, and reduce not only pain and discomfort associated with withdrawal syndrome but also the risk of serious injury or death associated with untreated symptoms.

98.     Several advisory organizations provide guidelines or standards on the provision of care for individuals who are going through withdrawal syndrome while in correctional custody, including the Federal Bureau of Prisons, the World Health Organization, and the National Commission on Correctional Healthcare. These organizations call on jails that do not already have sufficient withdrawal management protocols to develop them, and to hire and train staff to respond to withdrawal and the associated symptoms. There is consensus that **medically supervised** withdrawal from alcohol or an illicit substance is appropriate.

99.     Previous court rulings indicate that failure to provide incarcerated individuals medical treatment for withdrawal symptoms or forcing them to go through withdrawal without proper medical supervision may be a violation of constitutional rights.  Defendants in this case were on notice that their conduct violated Elisa Serna's Constitutional rights under the Fourteenth Amendment.

100.   Jail deaths from alcohol and drug withdrawal have received national attention. *See* https://www.motherjones.com/politics/2017/02/opioid-withdrawal-jail-deaths/

101.   The County of San Diego was well aware of the rate of drug use among its jail population.  See "SANDAG report: Drug use among inmates booked into jail at 20- year high.
https://www.sandiegouniontribune.com/news/public-safety/story/2020-10-22/sandag-report-drug-use-among-inmates-booked-into-jail-at-20-year-high  (last accessed December 30, 2020).

102.   The County and the supervisory defendants were aware that 82 percent of women and 79 percent of men booked into jail tested positive for drug use in 2019.

103.   Despite the obvious need to treat this obvious consequence of a known health risk, the County failed to implement best practices for monitoring withdrawals from drugs and alcohol.  The County failed to use Clinical Opiate Withdrawal Scale (COWS), which would have allowed staff to monitor the symptoms.

104.   The County failed to implement Clinical Institute Withdrawal Assessment (CIWA) for monitoring alcohol withdrawal.  CIWA is an evidenced based scoring system that is used to objectively assess the severity and progression of alcohol withdrawal system.

105.   COWS and CIWA use a point system so that medical professionals can keep track of the symptoms of withdrawal and provide continuity of care.

106.   The County of San Diego used no evidence-based system to treat withdrawal unlike most other jails and prisons.

107.   Does 11 to 20 are the medical care providers who saw Elisa Serna in medical distress and failed to provide life saving measures.   These Doe defendants failed to arrange for Elisa to be taken to the hospital; failed to provide the proper protocols for withdrawal; failed to provide medication to prevent vomiting; and failed to monitor Elisa even after days of vomiting.   These Doe defendants ignored the obvious symptoms of serious illness.

#### IV.    THE COUNTY OF SAN DIEGO, SHERIFF BILL GORE AND OTHER SUPERVISORY DEFEDANTS ARE DELIBERATELY INDIFFERENT TO INDIVIDUALS' CONSTITUTIONAL RIGHTS

108.    There was a failure to implement proper policies and procedures with respect to medically supervised withdrawal from alcohol and drugs at the San Diego County Jails.

109.    There had been a systemic failure to adhere to the written policies and procedures with respect to providing adequate health care to inmates in the San Diego County jails.

110.    There had been a systemic failure in San Diego County to investigate incidents of medical neglect, staff misconduct, and deaths in the Jail.

111.    San Diego County officials, CCMG and O'Brien were aware of the systemic problems with preventable deaths in the jails, but took no action to prevent further Constitutional violations.

112.    At the time of Elisa Serna's death, there had been a long-standing custom and practice of improper and inadequate investigations; cover-up of misconduct; and failure to discipline and train deputies and medical staff.

113.    The supervisory defendants were well aware of these problems before Elisa's death.

#### A. The Sheriff's Department Has More In-Custody Inmate Deaths than Any Other Large County in California.

114.    Deaths of sixty (60) inmates in the San Diego County jails in a span of five (5) years prompted a series of articles by Citybeat, a local newspaper. Citybeat reported that San Diego County had the highest mortality rate among California's largest jail systems based on data from 2007 to 2012.

115.    Other than to dispute the methodology Citybeat used (one used by the Department of Justice) to determine that San Diego had the highest mortality rate, the County of San Diego took no action to review its practices.

116.   In 2019, the Union Tribune published a series of articles regarding its 6-month investigation of in-custody deaths at San Diego County jails entitled, *Dying Behind Bars*.  Jeff McDonald, Kelly Davis, and Lauryn Schroeder, *Rate of jail inmate deaths in San Diego County far exceeds other large California counties*, THE SAN DIEGO UNION TRIBUNE, September 20, 2019, available at: https://www.sandiegouniontribune.com/news/watchdog/story/2019-09-19/dying-behind-bars-san-diego-county-jail-deaths.

117.   The article begins by observing, "At least 140 people have died in San Diego County jails since 2009, the year Bill Gore took over as sheriff.  That's an average higher than one inmate per month, every month, over the past 10 years. . . . A six-month investigation by The San Diego Union-Tribune shows that the county's jail mortality rate is the highest among California's largest county jail systems.  The grim history shows no sign of waning."

118.   In response to the Union Tribune's series *Dying Behind Bars*, Sheriff Gore wrote an op-ed that blamed the number of in-custody deaths on the inmates.  William Gore, *Sheriff Bill Gore: What U-T's coverage of jail deaths left out*, THE SAN DIEGO UNION TRIBUNE, September 27, 2019, available at: https://www.sandiegouniontribune.com/opinion/story/2019-09-27/sheriff-gore-jail-deaths-coverage.

119.   Gore wrote, "From 2009-2018, the Sheriff's Department booked over 871,000 inmates with 127 in-custody deaths. The largest contributor to jail deaths is not the actions or inactions of the sheriff, but rather a jail population in which a high percentage of inmates have serious mental illness, and a jail population that engages in extremely self-destructive behavior."  *Id*.  Gore then challenged the Union Tribune's methodology in comparing statistics among counties and explained that the Union Tribune's statistics were wrong because it did not account for counties that have city lockups.

120.    In response to Gore's criticism, the Union Tribune then revisited the death rates of inmates in California using California Department of Justice statistics from 2009 to 2018 and taking into account deaths in city jails.  The UT published the following statistics:

**Mortality rate with city deaths**

Deaths per 100,000 inmates

| County | Average daily population | 10-year average deaths | 10-year mortality rate |
|--------|--------------------------|------------------------|------------------------|
| San Diego | 5,211.9 | 12.8 | 245.6 |
| Los Angeles | 17,060.6 | 30 | 175.8 |
| San Bernardino | 5,643.5 | 8.9 | 157.7 |
| Santa Clara | 3,702.3 | 5.4 | 145.9 |
| Orange | 5,928.6 | 8.1 | 136.6 |
| Sacramento | 3,942.2 | 3.7 | 93.9 |

**Mortality rate without city deaths**

Deaths per 100,000 inmates

| County | Average daily population | 10-year average deaths | 10-year mortality rate |
|--------|--------------------------|------------------------|------------------------|
| San Diego | 5,211.9 | 12.7 | 243.7 |
| Los Angeles | 17,060.6 | 25.5 | 149.5 |
| San Bernardino | 5,643.5 | 8.8 | 155.9 |
| Santa Clara | 3,702.3 | 5.4 | 145.9 |
| Orange | 5,928.6 | 7 | 118.1 |
| Sacramento | 3,942.2 | 3.7 | 93.9 |

Source: California Department of Justice                                      U-T

Lauryn Schroeder, *San Diego has highest jail mortality rate among largest counties, even with new data*, THE SAN DIEGO UNION TRIBUNE, November 24, 2019, available at:

https://www.sandiegouniontribune.com/news/watchdog/story/2019-11-24/san-diego-has-highest-jail-mortality-rate-among-largest-counties-even-with-new-data

121.    Reporter Lauryn Schroeder noted that both the method advocated by Gore or the method originally used by the UT showed San Diego County had the highest death rate:

> Jail mortality rates are calculated by dividing the number of deaths by the average daily population in each jail, expressed in terms of 100,000. This is the same methodology used by experts, oversight groups and state and federal government agencies such as the Bureau of Justice Statistics. The rate allows an apples-to-apples comparison of jail systems of varying size.
>
> When looking only at county jail deaths, the 10-year rate in **San Diego County was 243.7 deaths per 100,000 inmates**, compared to 155.9 in San Bernardino, 149.5 in Los Angeles, 145.9 in Santa Clara, 118.1 in Orange and 93.9 in Sacramento.
>
> Under the new review, which includes deaths in city-run jails, **San Diego County still has the highest 10-year mortality rate of 245.6 deaths per 100,000 inmates**. It's followed by Los Angeles with 175.8 deaths, San Bernardino at 157.7, Santa Clara at 145.9, Orange at 136.6 and Sacramento at 93.9.
>
> *Id*. (emphasis added).

122.    According to the state Department of Justice data, San Diego County's death rate over the past 10 years was 50 percent higher than Los Angeles County's and two-and-a-half times the Orange County rate.

123.    On October 23, 2020, the San Diego County Taxpayers Association awarded journalists Jeff McDonald and Kelly Davis the 2020 "Media Watchdog Award" for their series, *Dying Behind Bars*

124.    Given Gore's numerous responses to public criticism, it is obvious that he was made aware of the persistent problems with the lack of medical care in the Jails.

/ / /

**B. Sheriff Gore, Lee, the County of San Diego, CCMG, O'Brien, and Does 21 to 30 were aware of a persistent and recurring pattern of Preventable Deaths and Serious Injuries Caused by the Sheriff's Department's Misconduct, Apathy, and Neglect.**

125.    There had been countless complaints made by inmates, family members, community members and the Jail's own staff regarding injuries caused by medical neglect and staff misconduct.

126.    At the time of Elisa Serna's death, there had been a long-standing custom and practice of improper and inadequate investigations; cover-up of misconduct; and failure to discipline and train deputies and medical staff.

127.    County Defendants were aware of the following examples of failure by Jail staff at County Jails leading to inmate deaths or serious injuries, including failures to <u>coordinate and share critical medical information among personnel</u>, and <u>failures to provide critical treatment</u> to inmate-patients who Jail staff knew suffered from serious disorders.  These examples include:

a. Between 2007 and 2012, there were eight deaths in San Diego's jails that were drug related.  They were either overdoses or physical complications due to withdrawal. Richard Diaz, a 40-year-old addict, died from a stomach obstruction after three days of seizures and ***vomiting due to heroin withdrawal.*** Had jail staff not failed to communicate Diaz's serious medical state, he would still be alive.

b. In 2008, after the suicide of Adrian Correa, a 21-year-old paranoid schizophrenic who had threatened to kill himself multiple times, CLERB expressed concern about a breakdown in communication during shift changes: "A checklist that includes the status of at-risk inmates and the Department's response plan would enhance continuity of care, monitoring and housing."  The County rejected this recommendation.

c. On June 25, 2011, Daniel Sisson died from an acute asthma attack made worse by drug withdrawal. The San Diego County Medical Examiner estimated in an autopsy report that Sisson had been dead for several hours when a fellow inmate found him.  The jail staff had failed to monitor him *despite his exhibiting signs of withdrawal and his vomiting in his cell* due to the lack of communication between staff.

d. In September 2012, Bernard Victorianne suffered for five days from drug overdose because the staff ignored his medical information that he had ingested a baggie of methamphetamine, and that he was to return to the hospital immediately if he became symptomatic of overdose. Bernard Victorianne was placed in segregation instead of Medical, where he was found dead, face-down, naked in his cell.  Staff had failed to input critical medical information in the JIMS system.   Staff had failed to communicate with each other Mr. Victorianne's medical alerts which required that the staff report symptoms of overdose and take him immediately to the hospital.

e. In 2014, former U.S. Marine Kristopher NeSmith committed suicide after the jail staff failed to treat Mr. NeSmith for his significant and known mental illness and a history of suicide attempts.  When Mr. NeSmith was last seen alive at about 10:00 p.m., a guard noticed a bedsheet fashioned into a rope as he was making a routine safety check throughout the detention center.  The deputy, without breaking stride, said something to the effect of, "NeSmith, what are you trying to do? Kill yourself? Take that thing down." This deputy failed to communicate this information to other jail staff. No other jail staff took any further action. Mr. NeSmith was later found dead, having hung himself.

f. In 2014, Ronnie Sandoval died in the Jail from drug overdose.   Mr. Sandoval showed obvious symptoms of overdose, sweating profusely and disoriented.  The corrections staff told the nursing staff that Mr. Sandoval needed medical treatment, two of them stating that Mr. Sandoval was *withdrawing from drugs*.  The nursing staff

did not summon help or treat him for overdose. The nurses failed to pass down information regarding Mr. Sandoval's condition during the shift change. Mr. Sandoval died from drug intoxication.

g. In 2014, Jerry Cochran, a known diabetic, was arrested after mumbling gibberish on the street. At the time of his arrest, Mr. Cochran was wearing his medical ID bracelet with an alert for diabetes, but his condition was not communicated. At the Jail, he fell face-forward off a bench. Mr. Cochran died from diabetic ketoacidosis, a condition caused by an insulin shortage that is rarely fatal if treated properly.

h. In 2015, Ruben Nunez, a schizophrenic mental health patient transferred from Patton State Hospital, died when jail doctors failed to treat a potentially lethal condition for water intoxication. The psychiatrists treating Mr. Nunez failed to read his medical records and failed to input critical medical information in JIMS. One of the psychiatrists testified that she did not know how to use JIMS to add "alerts", meaning the most critical information regarding a patient's care. She testified that she was never trained.

Despite the medical records from Patton Hospital reflecting hyponatremia, a condition caused by overconsumption of water, a nurse noted in Mr. Nunez's chart:

> "Informed I/P that he will seen [sic] by psych for f/u. Exercise as tolerated and *drink plenty of water.* I/P verbalizes understanding and agrees to plan."
> (Emphasis added).

This nurse failed to document Mr. Nunez's medical records, leaving nearly the entire seven pages of an intake form blank. According to one of the nursing staff, the intake nurses do not have sufficient time to read medical records or to conduct a thorough intake because of the number of inmates being booked at once. The intake nurses only have

sufficient time to look to whether the Jail will book the person into jail.

When Mr. Nunez was discovered in his cell covered in his own vomit, the Jail staff failed to take him to Medical for treatment.  This was despite the findings of one of the nurses that vomiting can be a symptom of a serious illness and it should be monitored.  Mr. Nunez died on the floor of his Jail cell.

i.  In 2016, Heron Moriarty was arrested after having a psychotic break. Despite multiple warnings by family members, including 28 telephone calls by his wife, the Jail staff failed to communicate his condition and failed to provide him psychiatric care.  On the sixth day, Mr. Moriarty was found dead in his cell, having hung himself.

j.  In 2016, Jason Nishimoto killed himself with a bedsheet on his fourth night in Jail, the evening before he was scheduled to see a psychiatrist.  His psychiatric condition was well known to the Jail staff, who ignored it.

k.  In February 2018, Paul Silva died in Jail after deputies pepper sprayed, tased, and beat Paul to death in his cell. The Jail staff knew Paul suffered from schizophrenia as it was well documented in the Jail's database system.  Law enforcement encountered Paul after his mother requested Paul be hospitalized because he refused to take his schizophrenia medication.  Paul was obedient with police officers at all times.  Jail staff classified Paul as a "book and release" meaning he was supposed to be released after 8 hours.  Instead, Paul decompensated as he stayed in temporary holding cells with little food, no blankets, no bed, and with constant light and noise for almost 36 hours.  The staff failed to communicate Paul's critical medical condition and failed to monitor him. After he went without food, sleep, and any medication, Paul began acting bizarrely. He could not comprehend deputies' commands and questions.  A CCMG nurse practitioner did not check Paul's medical record or review his medical history to determine whether

he needed psychiatric care.  She did not consult a medical doctor or psychiatrist.  Instead, deputies killed Paul Silva after they entered his jail cell.

l. In February 2018, Frankie Greer suffered a seizure and fell from the top bunk of his jail cell after Jail staff failed to give him his seizure medication and refused to give him a bottom bunk.  Mr. Greer repeatedly informed jail staff that he suffered from a seizure disorder and regularly took prescribed medication, which he brought with him when he was booked into the Jail. Jail staff failed to communicate to each other Mr. Greer's critical medical condition. Jail staff ignored Mr. Greer's statements and his requests for medication and a bottom bunk.  A CCMG doctor knew Mr. Greer had already missed several doses of his prescription medication but made no effort to administer it to him right away.  As a result, Mr. Greer suffered extensive head injuries and a traumatic brain injury when he fell from his top bunk, a distance of over six-feet.

m. In April 2018, George Gallegos died in the Jail from acute pneumonia and *dehydration*.  After being transferred to the San Diego County Jail from a psychiatric facility, Mr. Gallegos lost 50 pounds, nearly a quarter of his body weight.  A deputy only checked on Mr. Gallegos only because his pants were slightly pulled down, revealing feces soiled underwear.  Mr. Gallegos had been dead so long that he was cold to the touch.  His bunk and parts of his cell were covered in feces.

n. In April of 2018, Colleen Garot was denied medical care despite entering the Las Colinas with visible and severe head and facial injuries.  The medical staff, including Defendant Von Lintig, failed to properly diagnose and treat Ms. Garot who was obviously symptomatic of a serious brain injury.  For three days, the staff provided no medical care despite the fact that Ms. Garot was delusional and foaming at the mouth.  As a result of the delay in care, Ms. Garot is now completely incapacitated.

o. Michael Wilson collapsed in his cell and passed away in February 2019. Mr. Wilson suffered from hypertrophic cardiomyopathy and regularly took medication that allowed him to live. Without the medication, Mr. Wilson's lungs would fill with fluids. CCMG doctors did not give Mr. Wilson any medication.  Staff failed to provide the proper medication to Mr. Wilson, even after being notified multiple times by his family that Mr. Wilson will die without his heart medication. The medical staff ignored a court order which advised that Mr. Wilson needed to be monitored for a serious medical condition.

p. Jeremy Thomas, a 28-year-old former Marine died May 29, 2019 after he had been booked on drug charges. Mr. Thomas lost his hand in Afghanistan in 2011 and was featured in a Union-Tribune story two years ago about veterans being over-prescribed opioids for pain.  Mr. Thomas told medical staff that he was *going through withdrawal*.  Rather than treating him for withdrawal and monitoring him, he was sent to his cell. Shortly after, he was pronounced dead.

q. On May 6, 2019, six months before Elisa died, Tanya Suarez was suffering from a psychotic break at Las Colinas Jail after consuming drugs.  Tanya tried to gauge her eyes out while being booked into Jail.  The deputies cut Tanya's acrylic nails, leaving them jagged and sharp.  No one took Tanya to the hospital for care.  The nurse simply scheduled a regular medical sick call for the next day.  They left Tanya in a cell unattended.  Tanya began ripping her eyeballs out, which took over five minutes.  The deputies stood by Tanya's cell and watched Tanya gauge her eyes out.  Tanya was screaming.  One of the deputies recorded the entire incident on her cell phone.  They did not intervene to help. Tanya, who is 23 years old, is now permanently blind.

r. In January of 2020, deputies failed to conduct a mandatory safety check on an inmate struggling with drug addiction. CLERB  found that the deputy who was supposed to conduct "proof of life" checks in Blake Wilson's module spent

"approximately one second" looking into Wilson's three-person cell. More than eight hours passed between the time Wilson was last seen alive and when he was found dead.

128.    Even though inmates are dying or suffering catastrophic injuries at an alarming rate at San Diego County Jails, the medical and correctional staff whose actions or inactions cause the deaths are not investigated; not informed of their failures; not given further training or remedial instruction; and are not monitored or closely supervised after these adverse events.  In the Nunez, Silva, and Greer cases, no medical or correctional staff faced any consequence for their conduct.

129.    Gore, supervisory Does 21 to 30 and the County of San Diego had been advised repeatedly that the deputies were failing to conduct proper cell checks and failing to monitor the cells.   Despite this specific knowledge, defendants failed to take appropriate action.

130.    These are just a few examples of the customs and/or policies of the Sheriff's Department which sent the message to staff that negligence, and improprieties will be tolerated by the Department, even when a death results.

**C. External Audits and Reports Warn Gore and the County of Pervasive Failures to Adequately Train and Supervise Subordinates.**

131.    The County and its officials were well aware of the problems of the jail staff failing to use JIMS.  The Grand Jury took issue with the Jail Information Management System (JIMS), a database used for maintaining inmate records. According to jail staff who commented to jurors for the report, the staff have trouble sorting and retrieving information and the eleven-year-old software was in need of an update.  *See* https://www.nbcsandiego.com/investigations/Grand-Jury-Report-Criticizes-San-Diego-County-Jail-Facilities-381590761.html

132.    The Jail staff did not know how to use JIMS, the only system used in the Jails to communicate the medical needs of inmates.  The medical staff did not

know how to use JIMS to input critical information and they had not been trained on how to use JIMS to obtain patient information.

133.   Jail nurses do not know where in JIMS to input critical medical information which the sworn staff or housing deputies can access.  As a result, deputies do not know that the patients are suffering from serious medical conditions.

134.   Upon information and belief, Defendants did not properly document or communicate Elisa's condition to each other in the JIMS system.

135.   Defendant Von Lintig either did not know how to use JIMS or she chose to ignore the information contained in it.

136.   On November 8, 2016, the San Diego Sheriff's Department contracted for assistance regarding compliance with the NCCHC Standards for Health Services in Jails.

137.   In January 2017, the NCCHC provided a report to the San Diego Sheriff's Department after reviewing the practices of its Jails.

138.   As of 2017, two years before Elisa died, the County, Gore, Lee, Does 21 to 30, CCMG and Obrien were on notice of the following deficiencies from the NCCHC report:

139.   Las Colinas had 40 essential standards applicable to the facility.  One hundred percent of the applicable essential standards must be met in order to attain NCCHC accreditation.

140.   Las Colinas failed to meet 28 essential standards.

141.   Las Colinas failed to meet essential standards on continuous quality improvement program, emergency response plan; medication administration training; medication services; information on health services; receiving screening; initial health assessment; continuity and coordination of care during incarceration; patients with alcohol and other drug problems and ***intoxication and withdrawal***.

/ / /

142.   NCCHC found a backlog of 150 inmate/patient requests for health care during its visit to Las Colinas.

143.   NCCHC found that the responsible health authority (RHA) is the full-time medical administrator, who is normally in the administrative offices and rarely at the facilities. There was no specifically designated, on-site responsible physician as the on-site physicians are contracted employees.   NCCHC recommended that RHA be on site at Las Colinas at least weekly.

144.   NCCHC found that the Jails were failing to review inmates' deaths in a timely manner, including at Las Colinas.

145.   Health care providers were not being informed of any results of death reviews.

146.   NCCHC found:

J-G-03 Infirmary Care (E). This facility has designated beds called "Medical Observation Beds (MOB)"… ***A section of the procedure discusses patients with severe alcohol withdrawal, and directs the nurses to use the standard nursing protocols, which instructs them to administer Librium and document the patient's changing condition. There is no reference to consult a physician for a care plan or orders for a patient in substance withdrawal. MOB patients have access to a call button-type system to summon nurses; the nurses' station is not within sight or sound of the patients***.

147.   NCCHC found that as to Intoxication and Withdrawal, Las Colinas' most recent review of the nursing protocols occurred on July 10, 2008.

148.   From 2008 to 2019 when Elisa died, the supervisory defendants and the county of San Diego did nothing to update the protocols on withdrawals, continuing to use outdated ineffective methods while patients continued to die.

149.   San Diego County's decades-old protocol is based on references from four articles. It explains the subjective and objective assessment and plan for a patient going into withdrawal. It describes the monitoring to take place in the sobering cells on the second floor, but fails to address those inmates going through withdrawal in general housing, segregation or MOB.

150.    There is no reference to calling a physician to order medications or plan of care; the nurses manage the withdrawal using the protocol. Only when a nurse gets a blood pressure of less than 90/50 or a pulse less than 60 beats per minute is it recommended to call the physician.  This is contrary to best practices for medically supervised withdrawal.

151.    Individuals experiencing severe intoxication or withdrawal are required to be transferred immediately to a licensed, acute care hospital in the community.

152.    NCCHC recommended that Las Colinas research their protocols as "there are new standards regarding methadone, Naltrexone for extended-release injectable suspension, and the physician's role in withdrawal management."

153.    Does 21 to 30 are the supervisory defendants who were made aware of these persistent problems from withdrawal resulting in deaths and catastrophic injuries.  These supervisory defendants, including Gore, Lee, O'Brien and Does, took no action in the face of mounting deaths and the warnings from NCCHC regarding their failures to implement proper policies to monitor the health of inmates and provide medical care.  These supervisory defendants including Does 21 to 30 failures to implement a system for medically supervised withdrawal with proper medication.  They failed to supervise their staff on providing care to patients going through withdrawal which they knew was a daily occurrence in the jails.

154.    Although the County, Gore, Lee, CCMG, Does and O'Brien were aware of Constitutional deficiencies in the delivery of seriously needed medical and psychiatric care due to the NCCHC audit, the Grand Jury's report on JIMS, and the high number of deaths and injuries suffered by inmates, they took no steps to provide additional training and supervision to their subordinates.  The failure to provide additional training and supervision to their subordinates was a moving force causing the ultimate injury to decedent Elisa Serna.

**D. Sheriff Gore and the County of San Diego Refuse to Implement Protocols of Accountability and Transparency to Prevent Constitutional Violations and Inmate Deaths.**

155.    On September 20, 2019, the Editorial Board of The San Diego Union Tribune published a piece entitled, "Editorial: There's an alarming number of people dying in San Diego County jails.  It's inexcusable."  Available at: https://www.sandiegouniontribune.com/opinion/editorials/story/2019-09-20/death-rate-in-san-diego-county-jails-suicide-gore

156.    The U-T Editorial Board noted it had endorsed Gore's successful re-election campaign in 2018.  "But the jails need better oversight now.  It is inexcusable for death to be so much more common per capita in San Diego County jails than in other large California jail systems."  *Id*.  The Editorial Board wrote the Sheriff's Department deserved "not just scrutiny but criticism.  With an inmate dying every month, the Sheriff's Department needs to fix a culture that has tolerated death for so long and overhaul a system that has made it so common."  *Id*.

157.    After Gore criticized the U-T's investigative series *Dying Behind Bars* and questioned the publication's reporting and statistical methodology, the U-T's Editorial Board wrote a response, finding the Sheriff's Department's failures "unforgivable."  The Union Tribune's Editorial Board criticized Gore for his evasiveness, his attempts to avoid responsibility, and his refusal to approach the crisis with transparency:

> As a society, we all are responsible for the fate of the marginalized, the addicted and the mentally ill who find themselves in the sheriff's lock-up. **But as the administrator of our jails, Gore is the person we are all looking to for answers.  Unfortunately, unbelievably, he consistently refuses to give them.**

> He declined to be interviewed by U-T reporters.

> He declined to meet with the Editorial Board.

His consultant, statistician Colleen Kelly, refused to take reporters' phone calls, publish her data or provide details of her methodology.

Read the sheriff's rebuttal. Watch the video that shows what happened to Paul Silva in the sheriff's lock-up. Then ask yourself the question the Editorial Board is asking now: Is Gore "open to criticism and ready to embrace new approaches," as we wrote in our endorsement of him in 2018?

As we wrote last week, we don't doubt Gore is trying to reduce jail deaths. But the cases of abject failures by jail employees leading directly to deaths are infuriating. **Now we have the man in charge saying move along, this isn't worth his time?**

**If his approach reinforces already-cavalier attitudes of some jail staffers, San Diegans should be scared to death of being placed in Gore's system.**

The San Diego Union-Tribune Editorial Board, *Editorial: Reduce San Diego County jail deaths?  Sheriff Gore should at least discuss them*, THE SAN DIEGO UNION TRIBUNE, September 27, 2019, available at:

https://www.sandiegouniontribune.com/opinion/editorials/story/2019-09-27/san-diego-sheriff-bill-gore-jail-deaths (emphasis added)

158.   In a September 27, 2019 op-ed, Gore blamed inmates who suffered from mental illness and addiction for their tragedies.

159.   On April 2, 2019, Gore issued a statement to the Union-Tribune blaming the death of Oscar Leal on Oscar Leal.  Oscar Leal, who was arrested for failing a field sobriety test, was dead within 90 minutes of his initial contact with Sheriff's deputies after deputies pepper-sprayed and restrained Leal.  Gore stated that the death of persons in restraints while in custody is the fault of the dead person.

160. **Critical Incident Review Board (CIRB)**. Gore and County officials have manipulated the investigation process to threat the accountability and reform needed to prevent further deaths. The only mandatory internal review of in-custody deaths at the Sheriff's Department is conducted by its Critical Incident Review Board (CIRB). All deaths of jail inmates and other in custody deaths are reviewed by CIRB.

161. The Sheriff's Department publicly touts CIRB as an example of police oversight. For example, in a document entitled "A Glimpse Into Our Policies," https://www.sdsheriff.net/documents/UseOfForcePoliciesProcedures.pdf, the Sheriff's Department states it is "dedicated to building a culture of trust with our communities. . . . The Department is also proactive in the identification of possible opportunities for change in our policies, procedure, and training to affect consistent positive outcomes. We are committed to impartial and compassionate enforcement of the law." At the end of the document, the Sheriff's Department prominently lists CIRB as an example of oversight within the Sheriff's Department.

162. On June 9, 2020, shortly after the eruption of nationwide protests in response to the death of George Floyd, the Sheriff's Department released a "Use of Force Fact Sheet," https://www.sdsheriff.net/documents/use_of_force.pdf. The document states the San Diego Sheriff's Department does not "condone nor accept any racial profiling or acts of brutality. We take immediate action on any such complaint and conduct a comprehensive investigation. Not only are there readily accessible means for individuals to make complaints or notify the department about any possible mistreatment, **but the Sheriff's leadership team reviews all critical incidents to ensure proper and just responses were administered**. We are also proactive in the identification of possible

opportunities for change in our policies, procedure, and training to affect consistent positive outcomes." (Emphasis added.)

163.   Later, the document describes the Critical Incident Review Board. "The focus of the CIRB is to assess the department's civil exposure as a result of a given incident and to improve service delivery." *Id*. "CIRB carefully reviews the incidents from multiple perspectives-including training, tactics, policies, and procedures-**with the goal of identifying problem areas and recommending remedial actions**." *Id*. (emphasis added).

164.   In June 2011, Robert Faigin, the Chief Legal Adviser to the Sheriff's Department, authored an article entitled, "Critical Incident Review Board: Creation     and     Refinement,"     https://www.policechiefmagazine.org/critical-incident-review-board-creation-and-refinement/.  He writes, "Consistent with the public's microscopic examination of law enforcement is the expectation that law enforcement agencies will police themselves to ensure that police officers perform in accordance with laws and with departmental policies and procedures. One way that a law enforcement agency can meet the public's expectation of effective self-policing is through the establishment of a Critical Incident Review Board (CIRB)."

165.   Mr. Faigin's article claims that the purpose of CIRB is not to provide legal advice to the Sheriff's Department command staff, but to help the Sheriff's Department identify problems.  "CIRB is designed to help an agency review a critical incident, assessing both the positive and negative aspects of that incident. Without a review process, negative aspects of a law enforcement contact may go undetected. A department's lack of knowledge of issues resulting from a critical incident will certainly cause the department to be slow in taking remedial measures to address the incident or the conduct that caused the incident."  Mr.

Faigin notes, "[f]ailure to take action when called for can cause an agency to be liable for being deliberately indifferent to a known risk of harm."

166. Yet, while publicly touting CIRB as a mechanism of internal oversight and accountability, the Sheriff's Department has refused to disclose CIRB's findings and conclusions regarding inmate deaths. Mr. Faigin has filed numerous declarations in federal court to resist disclosure of CIRB reports. This is consistent with the attitude and conduct of Sheriff Gore: while attempting to appear responsive to public concerns about the conduct of Sheriff's Department personnel, Gore and the County have resisted accountability; resisted transparency; resisted scrutiny of their conduct and ignored criticism of the conduct of their subordinates; and evidenced apathy towards individuals in the custody of the Sheriff's Department who have suffered and died.

167. Because the County refuses to make any of the investigation materials public, it is never held to account to the public for its consistent refusal to discipline or train staff who engage in egregious misconduct.

168. NCCHC found that the Sheriff's Department failed to review inmates' deaths in a timely manner and failed to inform health care providers of any results of death reviews.

169. In 2007, a review of the Sheriff's Department by the OIR Group specifically criticized CIRB for failing to discipline individual deputies who commit misconduct and for failing to systematically hold individual deputies accountable for their actions.

170. Despite their awareness of the need to take concrete actions to address a crisis of soaring jail deaths in San Diego County facilities, Gore and the County have avoided responsibility; resisted transparency; refused to conduct transparent investigations to determine wrongdoing; refused to hold individual deputies and medical staff accountable; and refused to discipline these individual

staff members who commit misconduct that kills inmates.  This has created a culture of apathy and impunity at the Sheriff's Department.  As the Union-Tribune's Editorial Board noted, Gore's cavalier attitude toward inmate deaths reflects the attitude of his subordinates.  Because it is impossible for any individual Sheriff's Department subordinate to suffer discipline, there is a custom of encouraging neglect and abuse of seriously ill inmates, and Jail staff are permitted to act with impunity.  Thus, the failure to investigate and discipline subordinates was the moving force that caused the ultimate injury to decedent Elisa Serna.

**E.  California State Auditor Issues a Scathing Report on San Diego Jails.**

171.  Elisa Serna's death prompted a public outcry calling for accountability.  Community members called for the state of California to intervene.

172.  In July 2021, Assemblymembers Akilah Weber, Tasha Boerner-Horvath, Brian Maeinshein, Christopher Ward, Lorena Gonzalez, Senator Ben Hueso and Senate President Pro Tempore Toni Atkins requested the California state Auditor provide independently developed and verified information related to the death of inmates at the San Diego County jails.

173.  The Joint Legislative Audit Committee unanimously approved the request.

174.  In response, Assemblymember Chris Ward said "I applaud the Joint Legislative Audit Committee's decision to authorize an investigation into the alarming number of inmate deaths in San Diego County facilities.  The ongoing reports, and the community testimony at yesterday's JLAC committee hearing, are disturbing and highlight the need for oversight and accountability.

175.  Assemblymember Boerner Horvath said "Any public institution, whether it be a school, hospital, or a jail, has as a core obligation to keep those they serve safe, irrespective of how they got there.  When an institution fails at

that obligation, the only thing that can help correct that failure is a full, independent, and transparent accounting of what went wrong. That's what this audit is all about – transparency."

176.   On February 3, 2022, after a seven-month review, the California State Auditor said in a scathing report that San Diego County jails are so unsafe and deficient that state lawmakers should intervene by forcing the Sheriff's Department to change course. On this same date, Gore took early retirement, nearly a year before his term was to expire.

177.   After the state of California performed an audit of 815 deaths in the County Jails, Michael Tilden, acting state auditor, wrote: "Our review identified deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in-custody deaths."

178.   "These deficiencies related to its provision of medical and mental health care and its performance of visual checks to ensure the safety and health of individuals in its custody."

179.   Mirroring what the community members and experts have repeatedly told the Sheriff over the past decade, the Auditor wrote: "The high rate of deaths in San Diego County's jails (as compared to other counties) raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices."

180.   The audit said the Sheriff's Department "did not consistently follow up with" inmates who needed medical and mental health services, and concluded that lack of attention may have contributed to their deaths.

181.   The report noted that when deputies did check up on inmates, these "safety checks" often amounted to inadequate glances that sometimes missed inmates in distress.

182.   "In our review of 30 in-custody deaths ... based on our review of video recordings, we observed multiple instances in which staff spent no more than one second glancing into the individuals' cells, sometimes without breaking

stride, as they walked through the housing module," the audit said. "When staff members eventually checked more closely, they found that some of these individuals showed signs of having been dead for several hours."

183.    The auditors said San Diego County jails can only be fixed by legislation requiring the Sheriff's Department to implement a series of recommendations spelled out in the 126-page report.

184.    "In fact, our review identified deficiencies with how the sheriff's department provides care for and protects incarcerated individuals (that) likely contributed to in-custody deaths..."

185.    State auditors found that the department has yet to meaningfully implement recommendations made by independent experts over the last several years.

186.    "Given the ongoing risk to the safety of incarcerated individuals, the Sheriff's Department's inadequate response to deaths and the lack of effective independent oversight, we believe the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes," the report said.

187.    Six weeks later, lawmakers introduced the "Saving Lives in Custody Act" written to address what lawmakers said were systemic deficiencies in the jails, by raising the standard of care for prisoners.

188.    "Going to jail should not be a death sentence, and unfortunately, for too many, it has been," Assemblywoman Akila Weber said in introducing a bill that would tighten Sheriff's Department practices.

189.    "We wish this was something that we didn't have to legislate," said Assemblywoman Weber.

/ / /

/ / /

/ / /

/ / /

## V.     PLAINTIFFS' CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Deliberate Indifference to Serious Medical Needs (42 U.S.C. §1983)**
**[By the Estate of Elisa Serna Against Friederike C. Von Lintig, Lorna Roque, Danalee Pascua, Hazel Camama, Lacee Lovisa, Reishone Foster, and Does 3-20]**

190.  Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

191.  Defendants violated Elisa Serna's Fourteenth Amendment right to medical care by deliberate indifference to her serious medical needs.

192.  Defendants Friederike C. Von Lintig, Lorna Roque, Danalee Pascua, Hazel Camama, and Does 3 to 10 knew that Elisa Serna had been vomiting all of her food and liquids consecutively for 5 days and was not improving with their "treatment plan" of giving her more paper cups.

193.  Defendants were aware that Elisa's medical condition was serious because she fainted multiple times, had very low blood pressure, and had a low oxygen saturation level. Defendants also witnessed Elisa become incoherent and exhibit odd behavior, shouting "I can't walk!" and later believing she was on a bus while she was passed out in her wheelchair.

194.  Defendants knew Elisa's blood pressure was abnormally low. On November 11, at 1:15 a.m., Defendant Camama noted Elisa's blood pressure was low. On November 11 at 8:40 a.m., Defendant Roque noted a diastolic blood pressure reading of 59.  Defendants did not take any action to stabilize Elisa's blood pressure.

195.  Defendant Von Lintig saw Elisa in the MOB on November 11, at 1:53 p.m.  Defendant Von Lintig knew Elisa had been vomiting for 5 days, had low blood pressure, had been fainting and acting oddly. Defendant Von Lintig did not take Elisa's vitals or provide her with any care. Instead, she noted that Elisa was suspected of faking her spells for "secondary gain."

196.  Defendant Von Lintig knew that Elisa had not been treated for her obvious symptoms of withdrawal.

197.  Defendant Von Lintig again saw Elisa at 2:14 p.m. Defendant knew Elisa's oxygen saturation level was abnormally low, reading 87%. A normal O2 level is at least 95%.

198.  Von Lintig knew that another doctor had noted that the staff had failed to initiate a withdrawal protocol. Von Lintig knew that the other doctor had ordered medication for Elisa just the day before to address withdrawal.

199.  Defendant Von Lintig took no other action, again noting that she believed Elisa was faking her fainting spells, despite having several indicators that Elisa was critically ill.

200.  At 3:44 p.m., Defendant Roque took Elisa's blood pressure again. Her diastolic reading was even lower at 54. Defendant Roque did not notify any doctor or provide any care to Elisa.

201.  At 7 p.m., Defendant Pascua noted Elisa was displaying odd behavior and had labored breathing. Defendant did not take Elisa's vitals or provide Elisa any care.

202.  Pascua and Lovisa witnessed Elisa lose consciousness and hit her head on the wall. They did nothing. The closed the door behind them and left Elisa laying on the floor to die.

203.  Lovisa, Foster and Does 11 to 20 were deputies who saw Elisa in medical distress. They saw Elisa fall multiple times. They took no action. Defendant Foster, instead of helping Elisa, dragged her through the hallway into her cell.

204.  The nursing staff and deputies, including Does 3-20 ignored the obvious signs of medical distress. These defendants failed to provide proper medication as Elisa's condition was worsening.

/ / /

205.   Defendants were deliberately indifferent to Elisa Serna's known and serious medical need, which caused harm to the decedent.

206.   By failing to properly treat Elisa Serna's serious medical condition when she was vomiting and fainting, Defendants were deliberately indifferent to Elisa's serious medical need.

207.   As a direct consequence of these failures, Elisa's serious medical condition was ignored by the jail staff. As a result, Elisa was not referred for diagnosis or treatment; nor provided proper medication.  Elisa was not taken to the hospital for care.

208.   As a direct and proximate result of Defendants' deliberate indifference to Elisa Serna's serious medical need, Elisa experienced physical pain, severe emotional distress, and mental anguish for days, as well as loss of her life and other damages alleged herein.

209.   The conduct alleged herein caused Elisa Serna to be deprived of her civil rights that are protected under the United States Constitution which has also legally, proximately, foreseeably and actually caused Elisa Serna to suffer emotional distress, pain and suffering and further damages according to proof at the time of trial.

210.   The conduct alleged herein was done in deliberate or reckless disregard of decedent's constitutionally protected rights; justifying the award of exemplary damages against defendants in an amount according to proof at the time of trial in order to deter the defendants from engaging in similar conduct and to make an example by way of monetary punishment.  Plaintiff is also entitled to attorney fees and costs of suit herein.

/ / /

/ / /

/ / /

/ / /

## SECOND CAUSE OF ACTION
### Right of Association (42 U.S.C. §1983)
**[By Plaintiffs Brandon Honeycutt, S.H. Michael Serna, and Paloma Serna against Defendants Friederike C. Von Lintig, Lorna Roque, Danalee Pascua, Hazel Camama, Lacee Lovisa, Reishone Foster, and Does 3-20]**

211. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

212. Defendants deprived Elisa Serna of her rights under the United States Constitution to be free denial of medical care and denial of due process.

213. The aforementioned acts and/or omissions of Defendants in being deliberately indifferent to serious medical needs, health, and safety, which caused the untimely and wrongful death of Elisa Serna; violating Elisa Serna's civil rights; and deprived Plaintiffs Brandon Honeycutt, S.H., Michael Serna, and Paloma Serna of their liberty interests in the family relationship in violation of their substantive due process rights as defined by the First, Fifth, and Fourteenth Amendments to the United States Constitution.

214. There was no legitimate penological interest in failing to communicate critical medical information and denying access to medical care to an inmate in severe and obvious medical distress.

215. There was no legitimate penological interest in watching a woman lose consciousness and fall repeatedly and do nothing.

216. There was no legitimate penological interest in leaving a woman on the floor of her jail cell to die.

217. Defendants' deliberate indifference shocks the conscience.

218. The deprivation of the rights alleged above has destroyed the Constitutional rights of Elisa Serna's family, Brandon Honeycutt, S.H., Michael Serna, and Paloma Serna, to the society and companionship of their wife, mother and daughter which is protected by the substantive due process clause of the Fourteenth Amendment.

219.   The conduct alleged herein violated Elisa Serna's rights alleged above thereby resulting in a deprivation of Plaintiffs' rights alleged above which has legally, proximately, foreseeably and actually caused Plaintiffs to suffer emotional distress, pain and suffering, and further damages according to proof at the time of trial.

### THIRD CAUSE OF ACTION
### Failure to Properly Train (42 U.S.C. § 1983)
### [By the Estate of Elisa Serna against Gore, Lee, O'Brien, and Supervisory Doe Defendants 21-30]

220.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

221.   Defendants Gore, Lee, O'Brien, and supervisory Does 21-30 failed to properly train Friederike C. Von Lintig, Lorna Roque, Danalee Pascua, Hazel Camama, Lacee Lovisa, Reishone Foster, and Doe deputies and medical staff in the performance of their duties.  They failed to properly train their subordinates on how to deal with inmates in medical distress.

222.   Defendants failed to properly train their employees with regard to the need to communicate critical medical information to each other.

223.   Defendants failed to properly train their employees with regard to the treatment of withdrawals.

224.   Defendants failed to properly train their employees with regard to the treatment of dehydration.

225.   Gore, Lee and Supervisor Doe defendants had a non-delegable duty to ensure that all contract employees were properly trained to meet the needs of their patients.

226.   Under CCMG's contract with the San Diego Sheriff's Department, Mark O'Brien, as president and CEO, was responsible for training and supervising Friederike C. Von Lintig and other employees of CCMG.  O'Brien

had a responsibility to ensure Von Lintig and Does had sufficient training to evaluate and treat inmate-patients in a correctional setting. O'Brien had a duty to ensure Von Lintig and Does were properly trained about their responsibilities at the Jail, including their responsibility in evaluating and treating inmate-patients who had been vomiting for several days and the policies and protocols at the Jail regarding continuity of care.

227. Defendant Gore knew that his deputies were consistently failing to conduct proper cell checks, leading to numerous deaths and serious injuries. Gore knew that his housing deputies were failing to place patients and inmates in proper housing units where they could be monitored for their serious medical needs. Despite this knowledge, Gore failed to train his staff on conducting proper cell checks on medically vulnerable patients.

228. Gore, Lee and Does 21-30 knew that their subordinates were failing to properly treat withdrawal. They knew that deputies were failing to conduct proper cell checks and failing to monitor inmates in medical distress. They failed to discipline or train their subordinates despite multiple deaths and allegations of misconduct.

229. As a result of Defendants' failures to train their subordinates, Elisa Serna's medical condition was not properly treated and she was not properly monitored.

230. Elisa Serna's death was a foreseeable consequence of Defendants' failures.

231. Officials of the San Diego Sheriff's Department, acting under color of law, have subjected decedent Elisa Serna and other persons similarly situated to a pattern of conduct consisting of continuing, widespread and persistent pattern of unconstitutional misconduct.

232. Defendants have failed to maintain adequate and proper training necessary to educate deputies and medical staff as to the Constitutional rights of

inmates; and to prevent the consistent and systematic failure to provide medical care.

233.   Gore, Lee and Does 21-30 knew from multiple complaints, lawsuits and grand jury findings that the deputies and medical staff were failing to monitor patients going through withdrawal.  They knew that failing to monitor a patient going through withdrawal could be fatal.  They had specific knowledge from prior deaths of multiple inmates.  Defendants have failed to maintain adequate and proper training necessary to educate deputies and medical staff as to the need to monitor patients exhibiting symptoms of serious medical conditions.

234.   Despite repeated Constitutional violations, Defendants failed to train doctors, nurses and other staff on the necessary coordination of care of inmates suffering from serious medical conditions.

235.   Does failed to train medical doctors and nurses on the necessary care of inmates suffering from serious medical conditions including dehydration and withdrawal, and they failed to implement policies and procedures with respect to communicating such sensitive and critical information to ensure that inmates will be cared for.

236.   Despite specific knowledge that critical medical information was not being communicated from the medical staff to sworn staff, Defendants took no action.

237.   Despite their knowledge of previous instances of wrongful deaths in the jails as a result of the failure to communicate critical medical conditions, Defendants failed to properly train or retrain their deputies and medical staff to prevent deaths of inmates.

238.   The failure of all supervisory defendants to promulgate or maintain constitutionally adequate training was done with deliberate indifference to the rights of Elisa Serna and others in his position.

/ / /

239.   As a result, decedent Elisa Serna suffered, both physically and mentally, and died.

240.   As a direct consequence of the failure of Defendants to properly train their officers and medical staff, Elisa Serna suffered unconstitutional treatment and inhumane conditions during her detention.

## FOURTH CAUSE OF ACTION
### Failure to Properly Supervise and Discipline (42 U.S.C. §1983)
### [By the Estate of Elisa Serna against Gore, Lee, O'Brien, and Supervisory Doe Defendants 21-30]

241.   Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

242.   Defendants Gore, Lee, O'Brien, and Supervisory Doe Defendants 21-30 failed to properly supervise and discipline defendants Friederike C. Von Lintig, Lorna Roque, Danalee Pascua, Hazel Camama, Reishone Foster, Lacee Lovisa and Does 3-20 in the performance of their duties in evaluating physically ill patients who require hospitalization and treatment.

243.   These defendants failed to properly supervise their employees with respect to the dangers of dehydration and withdrawal despite their personal knowledge of the dangers of withdrawal syndrome.  These defendants knew withdrawal syndrome can occur with discontinuation of non-opioid substances as well, including alcohol and benzodiazepines.  They knew that withdrawals and/or dehydration could be fatal and that there had been prior deaths including that of Mr. Diaz, Mr. Sisson, Mr. Gallegos, Mr. Thomas and Mr. Sandoval.

244.   These defendants were personally aware of the repeated Constitutional violations committed by their subordinates vis a vis a pattern of refusal to provide medical care.

245.   O'Brien had a responsibility to ensure Von Lintig and Does had sufficient supervision to evaluate and treat inmate-patients in a correctional setting.  O'Brien had a duty to ensure Von Lintig and Does were properly

supervised about their responsibilities at the Jail, including their responsibility in evaluating and treating inmate-patients who had been vomiting for several days and the policies and protocols at the Jail regarding continuity of care.

246.    Defendant O'Brien was aware of the history of deaths of inmates at the San Diego Jails related to the failure to provide adequate medical care. O'Brien was aware of previous inmate deaths caused by the failure of contractors and contract medical staff to provide medical and psychiatric care to inmates with serious medical and psychiatric needs.  O'Brien was aware of the need to closely monitor and supervise his doctors and nurses and to ensure that they understood their responsibilities and job function in a correctional setting.

247. Defendants Does 3-20 acted under the direction and supervision of Gore, Lee, O'Brien, and Supervisory Doe Defendants 21-30 who set forth the standards, policies and procedures on treatment of inmates, including Elisa Serna.

248.    Pursuant to the policies and procedures set by Defendants Gore, Lee, O'Brien, and Supervisory Doe Defendants 21-30, Elisa Serna received grossly inadequate medical care despite her visibly worsening condition.

249.    As a result of the Defendants' historical failure to properly supervise and discipline their employees, Defendant Does 3-20 were deliberately indifferent to the serious medical needs of Plaintiff.

250.    All Defendants failed to properly supervise their subordinates with regard to the need to communicate critical medical information and the need to provide adequate care.  As a result, correctional officers and medical care providers denied care to Elisa Serna.

251. As a result of the defendants'' historical failure to investigate misconduct and failure to discipline, deputies and nurses continued to endanger the lives of patient/inmates without fear of accountability.  As a result, not a single deputy or nurse assisted Elisa receive an IV or take Elisa to the hospital. They all watched Elisa deteriorate and die.  As a result of the supervisor

defendants' lack of supervision and discipline, subordinates falsify medical records and incident reports without fear of discipline.

252.    Defendants failed to provide adequate supervision and discipline to the medical staff who are required to render medical care that meet the standards of the Constitution.

253.    Defendants failed to provide adequate supervision and discipline to sworn staff with regard to proper monitoring and conducting cell checks.  This was despite their specific knowledge from prior cases that the deputies were failing to conduct proper cell checks and safety checks.

254.    Defendants failed to promulgate and enforce adequate policies and procedures related to misconduct and the violation of citizens' civil rights by correctional officers and medical staff.

255.    Defendants have a widespread history of ratifying employee misconduct by failing to conduct appropriate investigations.

256.    Gore, Lee and Supervisory Does ratified Pascua's and Lovisa's actions in leaving a patient to die. They ratified Pascua's actions in falsifying medical records.  These defendants took no action against Pascua and Lovisa. They took no action to correct Pascua's intentional misrepresentation.

257.    Defendants were aware of previous instances of untimely and wrongful deaths in the San Diego County Jails related to inadequate provision of medical care, and failed to properly supervise and discipline their employees or agents.

258.    Defendants refused to investigate misconduct and/or took no remedial steps or action against correctional officers and medical staff.

259.    Upon information and belief, supervising officers were made aware of the misconduct or witnessed the Constitutional violations committed by the deputies and medical staff but failed to supervise or discipline them.

/ / /

260.   There has been an official policy of acquiescence in the wrongful conduct. Defendants failed to promulgate corrective policies and regulations in the face of repeated Constitutional violations.

261.   Defendants condoned and acquiesced in the abusive behavior of their subordinates by refusing to retrain them, discipline them, or correct their abusive behavior.

262.   Defendants were, or should have been, aware that the policy regarding supervision and discipline of staff who violated the civil rights of inmates or citizens was so inadequate that it was obvious that a failure to correct it would result in further incidents of dangerous and lawless conduct perpetrated by their subordinates.

263.   As a result of all Defendants' historical failure to properly supervise and discipline deputies, Defendants were deliberately indifferent to the needs of Plaintiff.  The failure to supervise and discipline was the moving force behind the misconduct of the deputies, the denial of medical care on the Plaintiff, and the resulting pain and suffering and death.

## FIFTH CAUSE OF ACTION
### *Monell* Municipal Liability Civil Rights Action (42 U.S.C. §1983)
### [By all Plaintiffs Against Defendants the County of San Diego and CCMG]

264.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

265.   There were longstanding and systemic deficiencies in San Diego jails' treatment of inmates. There deficiencies included the failure to render medical care, improper cell checks, improper housing assignments, inadequate medical staffing, lack of required training on screening, lack of communication of necessary and critical medical information among staff, and non-compliant medical policies and procedures.

/ / /

266.   Upon information and belief, the written policy on withdrawal from drugs and alcohol was deficient on its face. It did not sufficiently identify the nursing requirements for treatment of withdrawal.

267.   The policy on withdrawal dating back to 2008 was deficient on its face.  The County was made aware of this deficiency long before Elisa died.

268.   The written policy was deficient in its failure to specify the dosage and administration of medication to deal with the symptoms of withdrawal.  It was deficient in its failure to address protocol for vomiting and dehydration, which can be fatal.

269.   The written policy was deficient on its face on when nurses were required to refer the patient to a doctor or when to transport the patient to the hospital.

270.   The written policy was deficient on when to administer medication for withdrawal.

271.   The policy was deficient in that the County failed to implement the use of CIWA and COWS to monitor withdrawal.

272.   In addition, there was a *de facto* policy of allowing its staff to fail to render care to patients going through withdrawal and ignoring obvious and dangerous symptoms such as persistent vomiting and delirium.

273.   There was a *de facto* policy of leaving patients like Mr. Nunez, Mr. Sisson, Mr. Sandoval, Mr. Thomas and Mr. Diaz unattended in their cells who are vomiting or going through withdrawal.

274.   There was a *de facto* policy of ignoring a patient who had been vomiting for days without rendering any care.   This was despite the acknowledgment from Medical staff that vomiting could be a sign of a serious medical condition.

/ / /

/ / /

275.   There was a *de facto* policy of assuming that patients are lying and seeking "secondary gain" when they are exhibiting serious symptoms such as abnormal oxygen saturation levels and abnormal vital signs.

276.   The County's and CCMG's failure to train its deputies and medical staff on treatment of inmates in medical distress gives inference of a municipal custom that authorized or condoned deputy misconduct.

277.   Upon information and belief, the permanent, widespread, well-settled practice or custom of Defendant was to deny treatment to inmates in serious medical distress and to place inmates in administrative segregation or general population instead of the medical ward when inmates are in need of medical care.

278.   There was a custom and practice of disbelieving complaints of inmates when they request medical attention and denying them access to medical care.

279.   There was a custom and practice of assuming a patient was seeking "secondary gain" and denying patients medical care.

280.   There was a custom and practice of not properly screening inmates for medical care or treatment.

281.   There was a custom and practice of failing to communicate the medical needs of inmates between the medical staff and deputies.

282.    There was a custom and practice of not properly checking on the welfare of inmates, even those inmates known to have serious medical needs.

283.   There was a custom and practice of failing to conduct proper cell checks as required by County's own written policies.

284.   There was a custom and practice of not properly investigating misconduct of deputies and medical staff.

285.   There was a custom and practice of allowing, tolerating and/or encouraging staff to file incomplete or inaccurate reports; make false statement;

and to obstruct or interfere with investigations by withholding and/or concealing material information.

286.   There was a custom and practice of falsifying information during investigations of misconduct and misleading the investigations by the independent citizens' review board.

287.   There was a custom and practice of falsifying medical records.

288.   There were longstanding and systemic deficiencies in San Diego County of failing to investigate in-custody deaths.

289.   The training policies of Defendant COUNTY were not adequate to train its medical staff to handle the usual and recurring situations with which they must deal, including: (1) providing proper protocol for patients going through withdrawal; and (2) seeking immediate medical and psychiatric care for inmates in obvious distress.

290.   Treating patients going through withdrawal is a usual and recurring situation in the San Diego County Jails.

291.   Defendants County of San Diego and CCMG were deliberately indifferent to the widespread unconstitutional acts by its jail staff and failed to set forth appropriate policies regarding the treatment of inmates. The County and CCMG knew their failure to adequately train their staff made it highly predictable that its jail staff would engage in conduct that would deprive persons such as Elisa Serna of her rights.

292.   CCMG had specific knowledge regarding Defendant Von Lintig's failure to properly treat Colleen Garot and did nothing to train or supervise her.

293.   During the relevant period, all Defendant deputies, medical staff, and Does 3-30 were acting pursuant to the policies of Defendant County of San Diego and/or CCMG.

294.   Defendants were aware of the following:  that San Diego County had the highest mortality rate among California largest jail systems; that there had

been countless complaints made by inmates, family members, community members and the Jail's own staff regarding injuries caused by medical neglect and staff misconduct; and that failures to communicate critical medical information to coordinate care for inmate-patients with serious medical and psychiatric needs led to the deaths and serious injuries of Richard Diaz, Adrian Correa, Daniel Sisson, Bernard Victorianne, Ronnie Sandoval, Heron Moriarty, Kristopher NeSmith, Jerry Cochran, Ruben Nunez, Frankie Greer, George Gallegos, Michael Wilson, Tanya Suarez and many other patients.

295.  Defendants County of San Diego and CCMG were deliberately indifferent to the right of the plaintiff and others to be free from, and protected from, harm by the misconduct of its employees.

296.  The Sheriff Department's longstanding practice or custom was unconstitutional in that it was deliberately indifferent to a substantial risk of serious harm to inmates.

297.  As a direct result of the practice or custom of the County of San Diego and CCMG, Defendants, including Doe Defendants, denied medical care to Elisa Serna, causing Elisa's death.

298.  It is well-settled that the government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Further, the government's obligation to provide adequate medical care is non-delegable, as set forth in the Supreme Court's decision in *West v. Atkins*, 487 U.S. 42 (1988). In *West*, the Court determined that "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." 487 U.S. at 56 (holding that where the State delegated provision of inmate medical care to a private physician, the physician acted under color of state law, and actions of the physician could be attributed to the State).

299.   Both County and CCMG are responsible for the unconstitutional conduct of the individual private care providers.

300.   The unlawful and illegal conduct of Defendant deprived Elisa Serna of the rights, privileges and immunities secured to her by the Constitutions of the United States.

301.   As a direct, proximate and foreseeable result, Plaintiff suffered damages in an amount according to proof at the time of trial.

### SIXTH CAUSE OF ACTION
### Wrongful Death – CCP § 377.60 *et seq*.
### [By Brandon Honeycutt and S.H. against All Defendants]

302.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

303.   Plaintiffs allege all California state law claims as basis for state law wrongful death cause of action and incorporate later torts by reference.

304.   Defendants committed wrongful acts which proximately caused the death of Elisa Serna.  Specifically, Defendants, including Does 3-30, deprived Elisa Serna of her rights under the United States Constitution to be free from the punishment without due process and cruel and unusual punishment.

305.   Defendant Does' decision to deviate from the County of San Diego's own protocol as to the medical care of inmates was a substantial factor in causing Elisa's death.  It was reasonably foreseeable that failure to properly treat Elisa Serna, when she could not retain any food or water, was fainting, had very low blood pressure readings, and had a low oxygen saturation level caused her death.

306.   California Government Code § 845.6 creates an affirmative duty for jail officials "to furnish or obtain medical care for a prisoner in his custody." Elisa required prompt medical attention from Defendants. Defendants Roque, Pascua, Camama, Foster, Lovisa and Does had actual or constructive knowledge of Elisa's need for prompt medical attention and deliberately chose to not furnish

care. Defendants failed to discharge the duty imposed upon them by California Government Code § 845.6.

307.   The supervisory defendants' failure to train and supervise and to set proper policies on withdrawal and medical care proximately caused the misconduct of their subordinates.  Supervisory defendants, including Does 21-30 failed to train and supervise their deputies on proper cell checks and on providing medical care to inmates in medical distress.  This failure proximately caused the deputies to ignore Elisa Serna who continued to lose consciousness and fall to the ground.

308.   CCMG's and O'Brien's failure to train and supervise and take corrective action against Von Lintig proximately caused Von Lintig's failure to treat a gravely ill patient.

309.   As a direct and proximate result of Defendants' acts and/or omissions, described herein, Elisa suffered and died as set forth above. Defendant County of San Diego is liable for their employees' breaches of duty to summon required medical care while acting in the course and scope of their employment.

310.   These acts resulted in the death of Elisa Serna.

311.   The County of San Diego and CCMG are also responsible for the acts of individual and Doe Defendants under the theory of *respondeat superior*.

312.   The wrongful acts alleged above caused the death of Elisa Serna and have legally, proximately, foreseeably and actually caused severe emotional damages, including the loss of society, companionship, emotional distress, and further economic and non-economic damages according to proof at the time of trial.

/ / /

/ / /

/ / /

## SEVENTH CAUSE OF ACTION
### Negligence
### [By Estate of Elisa Serna against All Defendants]

313.  Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

314.  Plaintiffs have complied with Code of Civil Procedure §364 by providing a notice of intent to sue for medical negligence to Friederike c. Von Lintig, Lorna Roque, Danalee Pascua, and Hazel Camama on October 1, 2020.

315.  All Defendants had a duty to Plaintiff Elisa Serna to act with ordinary care and prudence so as not to cause harm or injury to another.

316.  Defendants Does, Von Lintig, Roque, Pascua, Foster, Lovisa, and Camama improperly, negligently, wrongfully, and recklessly failed to document or communicate Elisa's serious medical conditions.  They so negligently and carelessly examined, diagnosed, treated, failed to treat, and manage Elisa's care so as to allow and cause the damages as alleged above.  The negligence and carelessness of Defendants consisted of their failure to use that degree of skill and care ordinarily used by healthcare professionals engaged in the practice of their profession in the same or similar locality and under the same or similar circumstances.

317.  Doe Defendants improperly, negligently, wrongfully, and recklessly failed to provide proper housing where Elisa could be monitored.

318.  Defendants Does, Von Lintig, Roque, Pascua, Foster, Lovisa, and Camama improperly, negligently, wrongfully, and recklessly failed to take any action to monitor Elisa Serna despite her obvious symptoms of being serious medical distress.

319.  Defendants Does, Von Lintig, Roque, Pascua, Foster, Lovisa, and Camama improperly, negligently, wrongfully, and recklessly failed to place Elisa in proper housing where she could be monitored or they removed Elisa from

MOB where her critical condition could be monitored.

320.    Defendants Does, Von Lintig, Roque, Pascua, Foster, Lovisa, and Camama improperly, negligently, wrongfully, and recklessly delayed and failed to summon medical care to Elisa Serna who was in obvious physical distress and in acute need of urgent medical care.

321.    These supervisory defendants were well aware of the numerous failures of their subordinates with regard to proper screening, evaluation, treatment, and transportation of inmates suffering from a serious medical condition to a hospital.  Despite this knowledge, defendants Gore, O'Brien, Lee and supervisory Does improperly, negligently, wrongfully, and recklessly failed to set forth policies to remedy these failures.

322.    Defendants Gore, O'Brien, Lee and Does improperly, negligently, wrongfully, and recklessly failed to ensure that all patients going through withdrawal receive a treatment plan, appropriate evaluation by a physician, and continuity of care despite their knowledge that their subordinates' failures had resulted in needless deaths of multiple inmates going through withdrawal and despite their knowledge that the vast majority of inmates booked into the jail had recent drug use.

323.    All Defendants improperly, negligently, wrongfully, and recklessly failed to refrain from violating Plaintiff's rights as guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protected by law.

324.    By engaging in the acts alleged herein, Defendants failed to act with ordinary care and breached their duty of care owed to Elisa Serna.

325.    The County of San Diego and CCMG are responsible for the act of individuals and Doe Defendants under the theory of *respondeat superior*.

326.    Plaintiffs are informed and believe that Defendant County of San Diego, CCMG and Does maintained policies, practices and procedures that

allowed for and encouraged the denial of care which ultimately caused the death of Elisa Serna.    These policies, practices and procedures include without limitation Defendants' training procedures and practices with respect to supervision of the staff and policies and procedures with regard to providing necessary critical and urgent medical attention.

327.   By engaging in the acts alleged herein, all defendants failed to act with ordinary care and breached their duty of care owed to Elisa Serna.

328.   As a direct and proximate result of the Defendants' negligent conduct as herein described, Elisa Serna suffered physically and mentally in the amount to be determined at the time of trial.

329.   As a further proximate result of the Defendants' negligent conduct, Elisa Serna died.

330.   As a further proximate result of the Defendants' negligent conduct, Plaintiffs Brandon Honeycutt, S.H., Michael Serna, and Paloma Serna have lost their family member and suffered great emotional and mental harm in the amount to be determined at the time of trial.

331.   The conduct of the individual Defendants also amounts to oppression, fraud or malice within the meaning of Civil Code Section 3294 et seq. and punitive damages should be assessed against each defendant for the purpose of punishment and for the sake of example.

### EIGHTH CAUSE OF ACTION
### Violation of Cal. Civ. Code §52.1 – Survival Claim
### [By Estate of Elisa Serna Against Von Lintig, Roque, Pascua, Camama, Foster, Lovisa, County, CCMG and DOES 3-30]

332.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

333.   Plaintiff brings the claims in this cause of action as survival claims permissible under California law, including Cal. Code of Civ. Proc. Section 377.20 *et. seq.*

334.    By their acts, omissions, customs, and policies, DEFENDANTS Von Lintig, Roque, Pascua, Camama, Does, and COUNTY, each Defendant acting in concert/conspiracy, as described above, while Elisa Silva was in custody, and by threat, intimidation, and/or coercion, interfered with, attempted to interfere with, and violated Plaintiff's and Elisa Serna's rights under California Civil Code § 52.1 and under the United States Constitution and California Constitution as follows:

      a.    The right to be free from objectively unreasonable treatment and deliberate indifference to Elisa Serna's serious medical needs while in custody as a pretrial detainee as secured by the Fourth and/or Fourteenth Amendments to the United States Constitution and by California Constitution, Article 1, §§ 7 and 13;

      b.    Decedent's and Plaintiffs' right to familial association as secured by the First, Fifth and/or Fourteenth Amendments.

      c.    The right to enjoy and defend life and liberty; acquire, possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1;

      d.    The right to protection from bodily restraint, harm, or personal insult, as secured by California Civil Code § 43; and

      e.    The right to emergency medical care as required by California Government Code §845.6.

335.    Defendants' violations of Plaintiffs' and Decedent's due process rights with deliberate indifference, in and of themselves constitute violations of the Bane Act.[1]

---

[1] *See Atayde v. Napa State Hosp.*, No. 1:16-cv-00398-DAD-SAB, 2016 U.S. Dist. LEXIS 126639, at *23 (E.D. Cal. Sept. 16, 2016) (citing *M.H. v. Cty. of Alameda*, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013); see also, *Cornell v. City and County of San Francisco*, Nos. A141016, A142147, 2017 Cal. App. LEXIS 1011 at *58, f.n. 32 (Cal. Ct. App. Nov. 16, 2017) (approving M.H., supra.); *Reese v. County of Sacramento*, 888 F.3d 1030, 1043-44 (9th Cir. 2018) (following

336.    Alternatively, separate from, and above and beyond, Defendants' attempted interference, interference with, and violation of Elisa Serna's rights as described above, Defendants violated Decedent's rights by the following conduct constituting threat, intimidation, or coercion:

      a.     With deliberate indifference to Elisa Serna's serious medical needs, suffering, and risk of grave harm including death, depriving Elisa Serna of necessary, life-saving care for her medical and/or psychiatric needs;

      b.     Subjecting Elisa Serna to ongoing violations of her rights to prompt care for her serious medical needs over days, causing immense and needless suffering, intimidation, coercion, and endangering her life and well-being;

      c.     Choosing not to provide the required constant observation for inmates going through withdrawals;

      d.     Instituting and maintaining the unconstitutional customs, policies, and practices described herein, when it was obvious that in doing so, individuals such as Elisa Serna would be subjected to threat, intimidation, coercion, and ongoing violations of rights as Decedent was here.

337.    The threat, intimidation, and coercion described herein were not necessary or inherent to Defendants' violation of Decedent's rights, or to any legitimate and lawful jail or law enforcement activity.

338.    Further, all of Defendants' violations of duties and rights, and coercive conduct, described herein were volitional acts; none was accidental or merely negligent.

Cornell); *Rodriguez v. County of L.A.*, 891 F.3d 776, 799, 802 (9th Cir. 2018) (following Cornell).

339.   Further, each Defendant violated Plaintiff's and Decedent's rights with the specific intent and purpose to deprive them of their enjoyment of those rights and of the interests protected by those rights.

340.   Defendants COUNTY and CCMG are vicariously liable for the violation of rights by their employees and agents.

341.   Defendant County is vicariously liable pursuant to California Government Code §815.2.

342.   As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of Plaintiffs' and Decedent's rights under the United States and California Constitutions, Plaintiffs sustained injuries and damages, and against each and every Defendant is entitled to relief as set forth above, including punitive damages against all individual Defendants, and all damages allowed by California Civil Code §§ 52 and 52.1 and California law, not limited to costs attorneys' fees, treble damages and civil penalties.

## VI.     RELIEF REQUESTED

**WHEREFORE**, Plaintiffs pray as follows:

1.     For general and special damages according to proof at the time of trial;

2.     For punitive damages against individual defendants and CCMG;

3.     For all other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 U.S.C. §§ 1983 and 1988; California Code of Civil Procedure §§ 377.20 et seq., 377.60 et seq., and 1021.5; California Civil Code §§ 52 et seq., 52.1; 42 U.S.C. § 12132 and 29 U.S.C. § 794, and as otherwise may be allowed by California and/or federal law;

4.     Any other relief this court deems just and proper.

## VII.    DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the Constitution, Plaintiffs hereby demand a jury trial of this action.

Respectfully Submitted,

**IREDALE AND YOO, APC**

Dated:  April 1, 2022        s/ *Julia Yoo*

EUGENE IREDALE
JULIA YOO
GRACE JUN
Attorneys for Plaintiffs THE ESTATE OF
ELISA SERNA *et al*.